160 P.3d 1258

**STATE of Hawaiʻi, Plaintiff–Appellee,**

v.

**Bernardino MARIANO, Defendant–Appellant.**

**No. 27303.**

Intermediate Court of Appeals of Hawaiʻi.

May 31, 2007.

Phyllis J. Hironaka, on the briefs, Deputy Public Defender, for Defendant–Appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

WATANABE, Presiding Judge, LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Under Article I, section 7 of the Hawai'i Constitution, and contrary to the United

States Supreme Court's holding in *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), a statement taken at the police station after an unlawful arrest in the suspect's home remains subject to suppression as the "fruit of the poisonous tree," even though the police had probable cause to arrest all along. Accordingly, we vacate the May 3, 2005 amended judgment of the Family Court of the First Circuit (family court) that convicted Bernardino Mariano (Bernardino or Defendant) of terroristic threatening in the second degree.[1]

Bernardino raises three points of error on appeal:

1. The lower court erred in failing to suppress as a "fruit of the poisonous tree" [Bernardino's] statement made during his custodial interrogation which was a product of his unlawful arrest.

2. The lower court erred in ... finding that [Bernardino] had voluntarily, knowingly, and intelligently waived his *Miranda* rights when, (1) without having been offered the assistance of an interpreter and (2) following an ambiguous request for counsel, he submitted to [Honolulu Police Department (HPD) detective Andrew Brito's (Detective Brito)] custodial interrogation and provided a statement.

3. The trial court erred in admitting into evidence virtually the ENTIRETY of [Bernardino's wife's (Mrs. Mariano)] taped interview with [Detective] Brito as a "prior consistent statement" un-

der [Rule 613(c), Hawaii Rules of Evidence (HRE), Chapter 626, Hawaii Revised Statutes (1993) ].[2]

Opening Brief at 8, 10 & 14 (bolding omitted; emphasis in the original; footnote supplied). Because we vacate on Bernardino's first point, we do not decide his other two.

## I. Background.

### A. Bernardino's Arrest.[3]

On October 26, 2003, at around 9:30 in the morning, HPD officer Bil Keni (Officer Keni)[4] was the first of four police officers to arrive at Bernardino's house on an "abuse-type" call. Officer Keni found Mrs. Mariano and her two daughters standing near their neighbor's carport. When Officer Keni approached, Mrs. Mariano told him that her husband had threatened her during an argument and that she was frightened for herself and her daughters. Mrs. Mariano mentioned that Bernardino held a pouch in his hand during the argument, which possibly contained a knife. She then told Officer Keni that Bernardino was still in their residence. Officer Keni asked Mrs. Mariano for permission to enter the residence, but she did not respond to his request. No sound emanated from the Mariano household. Officer Keni and the other officers entered the house accompanied by the landlord. The police did not have a warrant.

One of the other police officers knocked on the front door. Officer Keni was under the impression that the knock caused the front door to open, but later admitted he was not

1. Hawaii Revised Statutes (HRS) § 707–715 (1993) provides, in pertinent part, that "[a] person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person ... [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]" (Format modified.) HRS § 707–717(1) (1993) provides that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716 [ (Supp. 2006) (terroristic threatening in the first degree) ]."

2. Rule 613(c)(1), Hawaii Rules of Evidence (HRE), Chapter 626, HRS (1993) provides:

    (c) Prior consistent statement of witness. Evidence of a statement previously made by a

witness that is consistent with the witness' [sic] testimony at the trial is admissible to support the witness' [sic] credibility only if it is offered after:

    (1) Evidence of the witness' [sic] inconsistent statement has been admitted for the purpose of attacking the witness' [sic] credibility, and the consistent statement was made before the inconsistent statement[.]

3. Culled from testimony given at the April 19, 2004 hearing on Bernardino Mariano's (Bernardino) motion to suppress the knife found in his bedroom.

4. The transcript of the jury trial spells police officer Bil Keni's name as "Bill Kini."

sure. The officers announced their presence and entered the house after getting no response. At Bernardino's bedroom door—which, according to Officer Keni, was definitely ajar—the police knocked and announced their presence and went in without waiting for a response. Bernardino was asleep in his bed. The police woke him up and had him identify himself. Bernardino was removed from the bedroom, handcuffed and arrested. On his way out of the bedroom, Officer Keni noticed a knife sheathed in a leather pouch on the dresser. He took the pouch from the dresser and opened it in the living room. Bernardino was then transported to the police station. By then, it was about 10:30 in the morning.

## B. Bernardino's Interrogation.

Later that day, Detective Brito was assigned to investigate Bernardino's case. At about 4:40 in the afternoon, Detective Brito took a statement from Bernardino in the police cell block. At a hearing to determine the voluntariness or suppression of the statement, Detective Brito described Bernardino's demeanor during the interview. "For the most part, he was composed. When he spoke of his children and some of the events, he had injected some of the events that had happened, he became very emotional, and he was crying at certain points."

■ Before reading Bernardino his *Miranda*[5] rights, Detective Brito asked him for some preliminary information, such as his name, address and phone number. Bernardino could not spell his name for the detective. He could remember his home address only after prompting by the detective. During the same preliminary colloquy, Detective Brito asked, "Anything unusual, you know, that happened to you ... when you were arrested and when you were transported to the station?" Apparently still shaken by his arrest, Bernardino answered,

I ... I ... just worried that I only, that they come by my house. Because I just stay sleep, wake me up one guy, plenty

guy, somebody stay like shoot me already. What happened, I cry like this, what happened. I no do nothing to you guys, I told them. I just like ... I cry, you know.

(Ellipses in the original.)

Bernardino testified at the voluntariness/suppression hearing that his primary language is Ilocano, which is what he speaks at home. Bernardino recalled that he went to school in the Philippines, but that he got up to "Grade 2 only" before coming to Hawai'i in 1979. At the time of the interview, Bernardino was working as a janitor at the Aloha Stadium. He said that he can speak English "a little." He maintained that he cannot read English and can write English only with difficulty. He claimed that he asked for an Ilocano interpreter because he could not understand Detective Brito, but the detective ignored his request and started the interview audiotape. Nevertheless, Bernardino was able to answer Detective Brito's questions, in English, over the course of a forty- or fifty-minute interview.

Bernardino further testified at the voluntariness/suppression hearing that he could neither read nor understand the HPD *Miranda* rights form Detective Brito read to him. He initialed the form when and where instructed. It was all the more difficult to understand what was going on because he was trembling, crying and not feeling well. Bernardino claimed that Detective Brito forced him to give the statement. Bernardino was asked, "What does the right to silence mean?" He answered, "He said I stop—you stop." When asked whether, as he sat at the witness stand, he understood constitutional rights, Bernardino responded, "What is the Constitution?" At one point during the reading of the *Miranda* rights, Bernardino interjected words to the effect of, "I no can understand. Sorry about that." At the hearing, Detective Brito testified:

> When he said, "I no can understand," it appeared to me that he was saying that he was incredulous, that he couldn't believe that he could stop this interview at any

5. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

time, not that he didn't understand what I was saying. He didn't understand the concept that he could stop at any time and that he did not have to talk to me.

## C. Bernardino's Statement.

After being apprised of his *Miranda* rights, Bernardino made a statement to Detective Brito. In the redacted audiotape of the interview that was played for the jury, Bernardino told the detective that he came home from work that morning feeling very sick from a cold. He asked his wife to heat up some food for him, but she refused and started yelling. This made Bernardino angry. He told his wife, "fuck you I going bust your head[.]" When they started arguing about money, Bernardino got even angrier. "I, I'm mad, I'm more mad." He admitted he might have told his wife he was going to kill her, but "I ... don't remember because I really mad." He also admitted pulling his knife in the presence of his wife, but denied opening it to expose the blade.

## D. Pretrial Proceedings.[6]

The day after the incident, the State filed a complaint charging Bernardino with terroristic threatening in the second degree. A number of motions followed. On November 19, 2003, the State filed a motion to determine the voluntariness of the statement Bernardino made to Detective Brito. On March 1, 2004, Bernardino filed a motion to suppress the knife seized from his bedroom. About a month later, Bernardino supplemented his motion to include the statement he made to Detective Brito.

The hearing on Bernardino's motion to suppress the knife was held on April 19, 2004. On May 20, 2004, the family court entered findings of fact, conclusions of law and an order granting Bernardino's motion to suppress the knife. The family court concluded that, inasmuch as the police entered the Mariano residence with neither warrant nor consent nor exigency, the intrusion was unlawful.

On August 24, 2004, the family court held a consolidated hearing on the State's motion to determine the voluntariness of Bernardino's statement to Detective Brito and on Bernardino's supplemental motion to suppress it. In its argument, the State put particular emphasis on the Supreme Court's holding in *Harris, supra*. At the close of the hearing, the family court stated:

> With respect to the fruit of the poisonous tree, the Court had earlier ruled that the initial entry into the house was illegal. Therefore, the Court suppressed recovery of the knife. However, the question is whether or not the statement constitutes the fruit of the poisonous tree. The Court says no to that, because there was a basis for the arrest of the defendant based upon the verbal threats—alleged verbal threats by the defendant made to the wife. Therefore, the Court's explanation for the statement is separate from the fruit of the poisonous tree. The Court's decision of [sic] the statement is based upon whether or not there was a custodial interrogation. Yes, there was. Should Defendant have been read his *Miranda* rights? Yes.

> . . . .

> The Court has to determine whether or not the defendant has waived these rights and whether there was a valid waiver. The Court looks at to [sic] the totality of the circumstances, which includes the background, experience, and conduct of the defendant during the preliminary questioning by the detective of the defendant. The Court has to look at the tape-recorded statement, the testimony of the detective on the stand, as well as the testimony of the defendant.

> In listening—listening to the audio—audio of the interview between the defendant and the detective, it is not—there's no dispute that the defendant had certain language difficulties with English. However, he was able to respond to the detective in a number of instances, such as his birth date, his age, social security number, his year of marriage, the names and ages of his children, his employment. With respect to alcohol consumption, he was able to respond to the detective.

---

6. The Honorable Rhonda A. Nishimura presided over the pertinent pretrial motions.

In terms of the Constitutional rights, there was some difficulty, but the detective did follow up with respect to those rights to remain silent, right to have an attorney. And there is some difference of opinion as to whether or not the defendant understood whether or not he could stop the questioning at any time. The detective's take on that was that he felt the defendant was incredulous in—in that he could stop the interview at any time; so there's a difference in opinion as to what was meant by that portion of the interview.

The family court orally concluded that the State had proved by a preponderance of the evidence that Bernardino knowingly, intelligently and voluntarily waived his *Miranda* rights.

Written findings of fact, conclusions of law and orders issued on September 10, 2004. They incorporated by reference the May 20, 2004 findings and conclusions issued in connection with Bernardino's motion to suppress the knife, including the conclusion that the intrusion into the residence was unlawful. Bernardino's motion to suppress his statement was granted in part and denied in part, as was the State's motion to determine the voluntariness of the statement. The partial nature of both orders was due to the family court's suppression of only those admissions elicited when Detective Brito showed Bernardino the illegally-seized knife. The family court declined to suppress the balance of the statement, relying heavily on *Harris, supra.*

### D. The Jury Trial.[7]

On April 13, 2005, the jury trial started. This was the second jury trial in this case. A previous trial was held in late August 2004, but the family court declared a mistrial because the jury deemed itself "hopelessly deadlocked."

Under direct examination, Mrs. Mariano related that she and her husband were arguing over money. He wanted some for cigarettes but she demurred because she needed it for rent. Bernardino got angry and threatened her. Mrs. Mariano remembered that he told her, "do you want me to break your—your face? And I'll kill you." He then took a pocket knife out of a pouch on his belt. "He took it out. He's demonstrating how he had it." When Mrs. Mariano saw the knife, she got scared and ran to her neighbor's house.

Anticipating cross-examination, the deputy prosecuting attorney (DPA) had Mrs. Mariano admit that she lied at the first trial. She admitted she lied when she testified that she told Bernardino, "I wish you dead." She acknowledged another prior prevarication—that she told her husband, "if you like we can kill each other." She agreed she was being deceptive when she testified that Bernardino only touched the knife at his belt and did not brandish it. She also admitted falsely denying the fear she felt during the incident. Finally, she acknowledged writing a letter to the DPA pleading that the case against her husband be dismissed. Mrs. Mariano explained, however, why she was testifying inconsistently but truthfully at the second trial: "Because he promise, promise that he was going to change. But after how many weeks he didn't change. And he told me that his promise, what he said before, is a lie."

Sure enough, on cross-examination defense counsel pointed out that at the first trial, Mrs. Mariano had testified inconsistently in several respects:

Q. Okay. And at the prior proceeding do you recall testifying that you said we kill each other?

A. Okay. Yes. I said that because he had promised me so many things and I wanted—I don't—I didn't want him to go to jail.

Q. Now, did you also testify at a prior proceeding that you told him you wish he was dead so that he wouldn't bother you about money?

A. Yes. I said that, Attorney. But we didn't argue about that on October 26. Because I just want him get off the hook, as I said.

Q. Okay. Now, you were fighting about money, right?

A. Yes, Attorney.

. . . .

7. The Honorable Patrick W. Border presided over both jury trials.

Q. Now, you previously testified that Mr. Mariano had a knife in his belt near the pocket. But he never took it out, right?

A. That's true. I said that. But the truth is he took it out.

Q. And when you previously swore—

A. That's why I ran away.

Q. Okay. When you previously swore to tell the truth in a prior proceeding, you were asked, So the defendant never took out the knife in front of you? And you said no.

A. Yes, Attorney. Because I just went get off the hook in this case.

Q. So you lied?

A. I did that, Attorney, because I wanted to get out of the hook. And that's why we hired you, Attorney, and because he promised that he would change.

Q. Okay. And you also testified previously that you were never scared of him, right?

A. Yes, Attorney I (indiscernible) all, everything. I did—I said that. I did everything because I thought we would get back together. But he didn't change.

Later on, during Bernardino's case, a transcript of the testimony in question from the first trial was admitted into evidence.

On redirect, and without objection, the DPA asked Mrs. Mariano about a statement she wrote on HPD form 252 when the police first arrived on October 26. The DPA's questions were essentially verbatim excerpts from Mrs. Mariano's 252 statement:

Q. Okay. And during—and in that statement you stated that you and your husband were fighting because of money, correct?

A. Yes, Attorney.

Q. Okay. And then you wrote, Because he like asked for our rent money. But I told him no because our rent—and he got mad. You wrote that, right?

A. Yes, Attorney.

Q. And then you wrote—I mean and then you wrote, He tell me I kill you and crack your face.

A. Yes, Attorney.

Q. And then you wrote, And I run away to our neighbor's house.

A. Yes, Attorney.

Q. Okay. And then you wrote, When I was still inside the house, he touched the knife in his waist. That's why I run away to our neighbor.

A. Yes, Attorney.

Q. And then you also write, When he touched the knife he said I gonna kill you. You wrote that, right?

A. Yes, Attorney. So I ran.

The relevant portion of the 252 statement itself was admitted into evidence, over defense counsel's objection that it was cumulative. The DPA denied that it was cumulative, calling it "physical evidence of supporting what she's saying." The DPA also defended its admission as a prior consistent statement under HRE Rule 613(c).

Mrs. Mariano had also made an audiotaped statement to Detective Brito later in the day of the incident. The DPA proffered that statement as well. Once again, defense counsel objected that it was cumulative, and once again the DPA contended it was an HRE Rule 613(c) consistent statement. The audiotape was admitted into evidence and played for the jury. Mrs. Mariano's statement was a comprehensive account of the incident, from its inception in the argument over money to its denouement in Bernardino's arrest. It contained confirmation of the testimony on direct which was attacked on cross; namely, the testimony that Bernardino brandished the knife and the testimony that Mrs. Mariano was scared. But it also included statements not theretofore touched on in the evidence: "He threatening me, he almost kill me." "Holding the knife on the waist, because he planning to maybe open like that." "He like—he like hit me." "That's why I sacrifice all those. But I try to move out again. I went mainland (indiscernible)."

After Mrs. Mariano stepped down, several of the investigating police officers testified for the State, including Detective Brito. During Detective Brito's testimony, the audiotape of Bernardino's statement to Detective Brito was played for the jury. The

Marianos' eleven-year-old daughter also testified for the State. She was in the kitchen during the incident, but she could hear her parents arguing about money. She also heard Bernardino say, "I'm going to kill you guys."

Bernardino testified in his own defense. He acknowledged that he and Mrs. Mariano had an argument that day over her refusal to give him cigarette money, but he denied threatening her in any way. He maintained he was incapable of threatening his wife: "I love her very much." On cross-examination, the DPA confronted Bernardino with his statement to Detective Brito. Bernardino then admitted he was so angry at his wife at the time that he might have threatened her, but he could not really remember. "I—at that time, I was mad, so there are many things that I could say."

At the beginning of his closing argument, the DPA marshaled the proof he was going to argue against Bernardino:

We not only have the testimony of [Mrs. Mariano] on the stand. We also have her statements to the police mere minutes after the incident occurred. We have the ... testimony of Officer Kinney [sic]. We have the testimony of ... Detective Sergeant Brito. We also have the testimony of the defendant's own daughter[.] And, finally, ladies and gentlemen, and probably most important ... of all, we have the defendant's own statements. And when you put all of this evidence together, you see what really happened on October 26, 2003.

On Bernardino's behalf, defense counsel urged the jury to accept the testimony Mrs. Mariano gave at the first jury trial, and to thereupon acquit Bernardino of an alleged threat that was nothing more than mere venting. The jury returned a verdict of guilty. An amended judgment was filed on May 3, 2005, and Bernardino filed his notice of this appeal fifteen days later.

## II. Discussion.

This is the Fourth Amendment to the United States Constitution (Fourth Amendment):

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Compare Article I, section 7 of the Hawai'i Constitution (Article I, section 7):

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Bernardino contends the statement he made to Detective Brito at the police station was the product of an unlawful arrest and thus, the "fruit of the poisonous tree" doctrine demanded its suppression. As the Hawai'i Supreme Court has explained, "the 'fruit of the poisonous tree' doctrine prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police." *State v. Joseph,* 109 Hawai'i 482, 498, 128 P.3d 795, 811 (2006) (citations and some internal quotation marks omitted).

The State does not dispute the family court's conclusion that Bernardino's arrest was unlawful, for "under both Federal and Hawaii Constitutions, law enforcement officers may not enter the home of a suspect to effect his arrest, without his consent or without prior judicial authorization, in the absence of exigent circumstances." *State v. Lloyd,* 61 Haw. 505, 510–11, 606 P.2d 913, 917 (1980). *See also Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest").

■ Hence the issue is squarely framed—whether the "fruit of the poisonous tree" doctrine prohibited the use of Bernardino's statement because it resulted from the exploitation of the unlawful arrest in his home. The State answered no, here and below, and the family court agreed, both relying on *Harris*. The family court reasoned:

> Although individuals have a legitimate expectation of privacy in their home, this protection is not designed to grant criminal suspects, like Defendant, protection for statements made outside their premises where police have probable cause to arrest the suspect for committing a crime. *Cf. New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). The initial arresting officers had probable cause to arrest Defendant based upon Defendant's wife reporting that Defendant verbally threatened her life, all of which occurred prior to the officers' entry into Defendant's home. The arrest of the Defendant was not predicated upon the illegal entry into Defendant's home or the subsequent seizure of the knife, which recovery was suppressed.

In *Harris*, the police had probable cause to arrest Harris for murder. Three officers entered Harris's apartment without a warrant. Once inside, they read Harris his *Miranda* rights and obtained an incriminating statement. The police arrested Harris and took him to the police station, where they again informed him of his *Miranda* rights and obtained a written inculpation. Yet a third, videotaped confession followed a third *Miranda* recital.

The question before the *Harris* Court was whether the second statement[8] should have been suppressed because the police violated *Payton* in effecting the arrest. The Supreme Court refused to apply the exclusionary rule because its application in this context would not serve its goal of deterring official lawlessness:

> But, as emphasized in earlier cases, "we have declined to adopt a 'per se or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978). Rather, in this context, we have stated that "[t]he penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *Id.*, at 279, 98 S.Ct., at 1063–1064. In light of these principles, we decline to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.

*Harris*, 495 U.S. at 17, 110 S.Ct. at 1642–43 (brackets in the original).

In other words, under *Harris*, a statement made by a suspect outside the home after an illegal arrest therein is simply and *per se* not suppressible as the "fruit of the poisonous tree" where there was prior probable cause. The *Harris* Court explained:

> Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' [sic] home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

*Id.* at 18, 110 S.Ct. at 1643. Further,

> Even though we decline to suppress statements made outside the home following a

---

**8.** The trial court suppressed the first and third statements. *New York v. Harris*, 495 U.S. 14, 16,

110 S.Ct. 1640, 1642, 109 L.Ed.2d 13 (1990).

*Payton* violation, the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris' [sic], moreover, the incremental deterrent value would be minimal. Given that the police have probable cause to arrest a suspect in Harris' [sic] position, they need not violate *Payton* in order to interrogate the suspect. It is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate *Payton*. As a result, suppressing a station house statement obtained after a *Payton* violation will have little effect on the officers' actions, one way or another.

*Id.* at 20–21, 110 S.Ct. at 1644.

With all due respect, we disagree with the *Harris* Court. The rule in *Payton* was designed to protect, not just "the physical integrity of the home[,]" *Id.* at 17, 110 S.Ct. at 1643, although that is wherein the Fourth Amendment and Article I, section 7 find their highest expression, *Id.* at 18, 110 S.Ct. at 1643, but ultimately the constitutional right of the *people* to be free of unreasonable searches and seizures and invasions of privacy. For a house is just a house, and does not become a home in the constitutional sense unless so imbued by the inherent rights of the householder. It is not merely the materially limited and located "persons, houses, papers, and effects" that are constitutionally protected, but more profoundly, the immanent "right of the people to be secure" therein. Fourth Amendment; Article I, section 7. For this reason, the *Harris* Court's focus on the limits of the physical house to the exclusion of the metaphysical home feels, at first blush, foreboding.

For while there was probable cause to arrest Harris and the police could have done so lawfully on his doorstep or on the street, to say that "the legal issue is the same" once Harris was removed from his home, *Id.* at 18, 110 S.Ct. at 1643, is to be oblivious to the unlawful arrest which led to his removal and any aftereffect it may have had on his decision to talk:

The majority's per se rule in this case fails to take account of our repeated holdings that violations of privacy in the home are especially invasive. Rather, its rule is necessarily premised on the proposition that the effect of a *Payton* violation magically vanishes once the suspect is dragged from his home. But the concerns that make a warrantless home arrest a violation of the Fourth Amendment are nothing so evanescent. A person who is forcibly separated from his family and home in the dark of night after uniformed officers have broken down his door, handcuffed him, and forced him at gunpoint to accompany them to a police station does not suddenly breathe a sigh of relief at the moment he is dragged across his doorstep. Rather, the suspect is likely to be so frightened and rattled that he will say something incriminating. These effects, of course, extend far beyond the moment the physical occupation of the home ends.

*Id.* at 28, 110 S.Ct. at 1648–49 (Marshall, J., dissenting). And while it may seem conceptually self-evident that suppression in a *Harris* situation would have minimal "incremental deterrent value" because police with probable cause "need not violate *Payton* in order to interrogate the suspect[,]" *Id.* at 20–21, 110 S.Ct. at 1644, the fact remains that the violation happened in *Harris*, and it happened again here.

When all is said and done, perhaps the most damning indictment of *Harris* is the powerful but perverse incentive it creates for police misconduct:

More important, the officer knows that if he breaks into the house without a warrant and drags the suspect outside, the suspect, shaken by the enormous invasion of privacy he has just undergone, may say something incriminating. Before today's decision, the government would only be able to use that evidence if the Court found that the taint of the arrest had been attenuated; after the decision, the evidence will be admissible regardless of whether it was the product of the unconstitutional arrest. Thus, the officer envisions the following best-case scenario if he chooses to violate the Constitution: He avoids a major ex-

penditure of time and effort, ensures that the suspect will not escape, and procures the most damaging evidence of all, a confession. His worst-case scenario is that he will avoid a major expenditure of effort, ensure that the suspect will not escape, and will see evidence in the house (which would have remained unknown absent the constitutional violation) that cannot be used in the prosecution's case in chief. The Court thus creates powerful incentives for police officers to violate the Fourth Amendment. In the context of our constitutional rights and the sanctity of our homes, we cannot afford to presume that officers will be entirely impervious to those incentives.

*Id.* at 32, 110 S.Ct. at 1650 (Marshall, J., dissenting) (footnote omitted). We must part ways with the *Harris* Court.

■ "[W]e are free to give broader privacy protection than that given by the federal constitution[,]" *State v. Detroy,* 102 Hawai'i 13, 22, 72 P.3d 485, 494 (2003) (citations and internal quotation marks omitted), and "have often extended the protections of the Hawai'i Constitution beyond those of the United States Constitution[,]" *State v. Mallan,* 86 Hawai'i 440, 448, 950 P.2d 178, 186 (1998) (citations omitted), particularly in the search-and-seizure context:

> Textual support for this expansive approach inheres in the prohibition against "unreasonable ... invasions of privacy" contained in article I, section 7 but not found in the Fourth Amendment. *See, e.g., State v. Lopez,* 78 Hawai'i 433, 445–47, 896 P.2d 889, 901–03 (1995) (relying in part upon the textual accretion, requiring actual authority for third-party consents to search, in contradistinction to the United States Supreme Court's acceptance of mere apparent authority).

*State v. Ramos,* 93 Hawai'i 502, 507, 6 P.3d 374, 379 (App.2000) (ellipsis in the original).

We cannot condone the parsimonious Fourth Amendment protection the Supreme Court doled out in *Harris.* We hold, under Article I, section 7, that a statement obtained by the police outside the home after a *Payton* violation but on prior probable cause nevertheless remains subject to suppression as the "fruit of the poisonous tree." That each such case must be judged on its own terms is a commonplace. The pertinent point, *contra Harris,* is that each case must indeed be judged.

■ The State argues that Bernardino's statement was not the result of an unlawful arrest. "Defendant's statement was subsequently obtained through an independent, lawful source—his waiver of his Fifth Amendment right to remain silent." Answering Brief at 25 (citation omitted). However, as the Supreme Court stated in a pre-*Harris* case, "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (citation omitted).

■ The question is more complex than that. The *Brown* Court elaborated:

> The question whether a confession is the product of a free will ... must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Id.* at 603–04, 95 S.Ct. at 2261–62 (citations and footnotes omitted). To put it another way,

> Admissibility is determined by ascertaining whether the evidence objected to as being the "fruit" was discovered or be-

came known by the exploitation of the prior illegality or by other means sufficiently distinguishable as to purge the later evidence of the initial taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a "fruit" and, therefore, is admissible. *Wong Sun v. United States, supra.*

*State v. Medeiros*, 4 Haw.App. 248, 251 n. 4, 665 P.2d 181, 184 n. 4 (1983).

■ The potential factors to be considered in deciding attenuation *vel non* can be endlessly elaborated:

> Among the criteria most often considered are the time and place of the subsequent confession, the manner of interrogation, whether there was representation by counsel, the defendant's mental condition, conduct of the police, whether the defendant has had an opportunity to speak with family and friends, whether the defendant is in a position where he believes that his first confession has made his present position hopeless, and whether the subsequent confessions were a product of interrogation or voluntarily made.

*Id.* at 252–53, 665 P.2d at 184–85 (citations omitted). However, in the course of deciding that the applicable *Medeiros* factors favor exclusion, we found several that were compelling. Sick and tired, Bernardino was awakened in his own bed by several gun toting police officers. Crying, he was handcuffed, arrested and taken to cell block. Though several hours elapsed until Detective Brito questioned him, the audiotape of his interrogation reveals an unsophisticated suspect still crying and emotional and still viscerally impressed by the circumstances of his illegal arrest:

I ... I ... just worried that I only, that they come by my house. Because I just stay sleep, wake me up one guy, plenty guy, somebody stay like shoot me already. What happened, I cry like this, what happened. I no do nothing to you guys, I told them. I just like ... I cry, you know.

(Ellipses in the original.) And while there is nothing in the record that indicates bad faith on the part of the police, save for the naked illegality of their entrance, one wonders why they felt it necessary to employ the fig leaf of the landlord.

■ In any event, we decide that Bernardino's statement to Detective Brito was the "fruit of the poisonous tree" of his unlawful arrest. As such, it should have been suppressed. However, inasmuch as there was independent evidence of guilt, we must ask the further question, whether the error was harmless beyond a reasonable doubt. *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995). We cannot say that it was.

Bernardino's statement to Detective Brito was a complete and utter confession to the crime. Indeed, during closing argument the DPA himself deemed Bernardino's statement the most important in the State's entire arsenal of evidence. And Bernardino consistently denied the crime before the jury until he was confronted with his statement, whereupon he was obliged to allow that it could have happened. The erroneous admission of Bernardino's statement was not harmless beyond a reasonable doubt, *Holbron, supra,* and there must be a new trial. In light of our disposition, we need not reach Bernardino's second and third assignments of error.[9]

### III. Conclusion.

The May 3, 2005 amended judgment of the family court is vacated and the cause remanded for a new trial.

---

9. With respect to Bernardino's third point of error, we observe that the admissibility of an HRE 613(c)(1) prior consistent statement does not necessarily provide *carte blanche* admissibility to the entire colloquy of which the prior consistent statement is a part. *Cf. State v. Ortiz*, 91 Hawai'i 181, 193–95, 981 P.2d 1127, 1139–41 (1999).