259 P.3d 172 (2011)
171 Wash.2d 907
STATE of Washington, Respondent,
v.
James Robert ESERJOSE, Appellant.
No. 82491-6.
Supreme Court of Washington, En Banc.
Argued June 10, 2011.
Decided June 30, 2011.
*174 Thomas E. Weaver Jr., Attorney at Law, Bremerton, WA, for Appellant.
Kevin M. Anderson, Jeremy Aaron Morris, Kitsap County Prosecutor's Office, Port Orchard, WA, for Respondent.
ALEXANDER, J.
¶ 1 We granted direct review of James Eserjose's conviction on a charge of second degree burglary. He assigns error to the trial court's conclusion that a confession he gave to a deputy sheriff was admissible at trial. We affirm the trial court.

I
¶ 2 In the early morning hours of August 29, 2008, the "Latte On Your Way" coffee shop in Kitsap County was burglarized. When Kitsap County Deputy Sheriff Heather Wright responded to the shop's burglar alarm, she discovered signs of forcible entry; however, aside from shards of broken glass on the floor and an opened cash register drawer and freezer door, the shop's interior appeared essentially undisturbed. The shop's manager soon arrived on the scene and discovered that approximately $400 had been taken from a can in the freezer.
¶ 3 Later that day, a man identifying himself as James Kordell called 911 with information about the burglary. Kordell later met with Deputy Wright at the Poulsbo Police Department and informed her that he worked for the coffee shop owners as an electrician. He went on to say that his former roommate, Joseph Paragone, and another man, James Eserjose, had been responsible for burglarizing the coffee shop. Kordell indicated that the men lived at the home of Eserjose's parents in Illahee.
¶ 4 Kordell provided Deputy Wright with the address of Eserjose's parents' house. Deputy Wright, who was assigned to North Kitsap County, then contacted Sergeant Clithero of the Kitsap County Sheriff's Office and requested that deputies assigned to the central area of Kitsap County arrest Paragone and Eserjose. At approximately 1:30 a.m., Clithero, together with Deputies Sapp, Swayze, and Baker, went to the address that had been provided by Kordell. Although the deputies did not possess an arrest warrant or a search warrant, one of them knocked on the front door of the house. When James Eserjose opened the front door, a deputy asked him if Paragone was at the home. Eserjose responded that Paragone was upstairs sleeping and that he would go get him. Eserjose then went upstairs, leaving the door open.
¶ 5 Eserjose's father then came to the door and invited the deputies into the house, saying that he wanted to close the door to keep out the cold air. Once inside, the deputies stood in the entryway at the bottom of the stairs that led to the second floor of the house. From there, the deputies could see a portion of the upstairs hallway. After waiting about a minute, the deputies talked amongst themselves about the delay and determined that they should ascend the stairs in order to arrest Paragone and Eserjose. Eserjose's father told the deputies to be careful of his dog upstairs because he did not want them to be surprised and harm the animal.
¶ 6 The deputies arrested Paragone in the hallway. Eserjose was arrested just outside the door to his bedroom. After effecting the arrest, the deputies then took the two men outside the house and placed them in separate patrol cars. Deputy Sapp read Eserjose his Miranda[1] rights through the open door of his patrol car and then took him to the Silverdale Office of the Kitsap County Sheriff. *175 The deputy did not, however, ask Eserjose any questions about the burglary on the way to that office.
¶ 7 At the sheriff's office, Eserjose was again advised of his Miranda rights and he signed a form acknowledging that he understood these rights. Although he initially denied any knowledge of the burglary, he ultimately confessed after being told that Paragone had already done so.
¶ 8 The State charged Eserjose in Kitsap County Superior Court with second degree burglary.[2] Eserjose moved to suppress his confession on the ground that his arrest was unlawful. Following a hearing on Eserjose's motion, the trial court entered findings of fact and conclusions of law, determining that, although the deputies had probable cause to arrest Paragone and Eserjose and consent to enter the home where the arrest was made, they exceeded the scope of the consent when they entered the upstairs hallway and effected the arrests.[3] The trial court held, therefore, that the arrest of Eserjose was unlawful. The State has not challenged that conclusion. See Br. of Resp't at 8 n. 1, 15. The trial court, nevertheless, determined that Eserjose's confession was admissible under New York v. Harris, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), a Fourth Amendment case that addressed the admissibility of a confession that a suspect gave at a police station after being unlawfully arrested in his home. It, therefore, denied the suppression motion. On the basis of stipulated facts, the trial court then found Eserjose guilty of second degree burglary. Eserjose petitioned this court for direct review, and we granted the petition.

II
¶ 9 We review conclusions of law relating to the suppression of evidence de novo. State v. Gaines, 154 Wash.2d 711, 716, 116 P.3d 993 (2005). "Unchallenged findings of fact entered following a suppression hearing are verities on appeal."[4]Id. (citing State v. O'Neill, 148 Wash.2d 564, 571, 62 P.3d 489 (2003)).

III
¶ 10 The broad question before us is whether the trial court erred in admitting Eserjose's confession. Eserjose contends that, because he was unlawfully arrested, his confession should have been suppressed. There is no dispute that the arrest was unlawful, the United States Supreme Court having held that, in the absence of exigent circumstances, the Fourth Amendment prohibits police officers from making a warrantless and nonconsensual entry into a suspect's home in order to effect an arrest. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In the Harris case, however, the Court determined that, where the police have probable cause to arrest a suspect, the federal exclusionary rule[5] does *176 not bar statements made by the suspect outside his home, even though those statements were made following an illegal arrest inside the home in violation of Payton. Harris, 495 U.S. at 21, 110 S.Ct. 1640. Because Eserjose has not challenged the trial court's conclusion that the information Kordell provided to the deputies gave them probable cause for his arrest, the confession he gave at the sheriff's office is admissible under the Fourth Amendment pursuant to Harris.

A. Is Harris compatible with article I, section 7 of the Washington Constitution?
¶ 11 Eserjose concedes that Harris is controlling under the Fourth Amendment. He contends, though, that Harris is incompatible with article I, section 7 of the Washington Constitution, it being well settled that this provision is often more protective than the Fourth Amendment in the search and seizure context.[6]State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003). Our state's exclusionary rule, moreover, is generally less permissive than its federal counterpart, the rule having been described as "nearly categorical." State v. Winterstein, 167 Wash.2d 620, 636, 220 P.3d 1226 (2009). That rule is intended to protect individual privacy against unreasonable governmental intrusion, to deter police from acting unlawfully, and to preserve the dignity of the judiciary by refusing to consider evidence that has been obtained through illegal means. State v. Bonds, 98 Wash.2d 1, 12, 653 P.2d 1024 (1982).
¶ 12 The State points out that this court has recognized exceptions to Washington's exclusionary rule, such as the independent source exception, which this court has recognized in State v. Coates, 107 Wash.2d 882, 887, 735 P.2d 64 (1987), and Gaines, 154 Wash.2d 711, 116 P.3d 993. Whether the exception carved out in Harris is compatible with article I, section 7, however, is an open question.[7] Courts in other states have considered whether Harris is compatible with their constitutions, but the results are mixed. The Supreme Court of Arizona, for example, adopted the Harris exception in State v. Cañez, 202 Ariz. 133, 42 P.3d 564 (2002). Notably, Arizona's article II, section 8 is identical to Washington's article I, section 7. On the other hand, in State v. Mariano, 114 Hawai`i 271, 281, 160 P.3d 1258 (Ct.App. 2007), the Intermediate Court of Appeals of Hawaii said, "We cannot condone the parsimonious Fourth Amendment protection the Supreme Court doled out in Harris." It went on to say that article I, section 7 of the Hawaii Constitution[8] is more protective than the Fourth Amendment. Similarly, the Supreme Court of Connecticut concluded that the Harris exception falls short of the protection required by that state's constitution. State v. Geisler, 222 Conn. 672, 690, 610 A.2d 1225 (1992), abrogated on other grounds by State v. Brocuglio, 264 Conn. 778, 826 A.2d 145 (2003); see also State v. Luurtsema, 262 Conn. 179, 811 A.2d 223 (2002), overruled on other grounds by State v. Salamon, 287 Conn. 509, 949 A.2d 1092 (2008).
¶ 13 In order to determine whether the Harris exception is compatible with article I, section 7 of our state's constitution, it is necessary to consider the Court's rationale in Harris very carefully. As noted above, the United States Supreme Court rested its decision in that case on the fact that the police officers there had probable cause to believe that the suspect had committed a felony before they made their warrantless entry into the suspect's home. The Court emphasized that a warrantless arrest is generally permissible *177 so long as it is supported by probable cause. Harris, 495 U.S. at 17-18, 110 S.Ct. 1640 (citing United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). In distinguishing its decision in Harris from its earlier decision in Payton, which "drew a line at the entrance to the home," the Court said, "Nothing in the reasoning of that case suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house." Id. at 18, 110 S.Ct. 1640. The Court was expressing the view that, once the suspect was outside the constitutionally protected space of his home, the police had the legal authority to keep him in custody and question him. In that regard, it explained that, "[b]ecause the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given Miranda warnings, and allowed to talk." Id. Having decided that the suspect was in legal custody, the Court went on to hold that the suspect's confession was properly admissible.
¶ 14 The United States Supreme Court also distinguished its decision in Harris from that in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In Brown, the record showed that the police officers did not have probable cause to effect an arrest, let alone obtain an arrest warrant, when they entered the suspect's home. However, after removing the suspect from his home and transporting him to the police station, the police officers informed him of his Miranda rights and obtained a confession. The Supreme Court held that the giving of Miranda warnings does not automatically "purge the taint of an illegal arrest." Id. at 605, 95 S.Ct. 2254. In rejecting the notion that Miranda warnings, by themselves, necessarily break the causal connection between the illegal arrest and the subsequent confession for Fourth Amendment purposes, the Court also rejected a "but for" rule that would regard all evidence as "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Id. at 599, 603, 95 S.Ct. 2254. Rather, to ensure that police had not exploited the Fourth Amendment violation, the Court reaffirmed the attenuation analysis of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963): "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be `sufficiently an act of free will to purge the primary taint.'" Brown, 422 U.S. at 602, 95 S.Ct. 2254 (quoting Wong Sun, 371 U.S. at 486, 83 S.Ct. 407).
¶ 15 In Harris, the United States Supreme Court did not engage in the attenuation analysis it employed in Brown, stating that "attenuation analysis is only appropriate where, as a threshold matter, courts determine that `the challenged evidence is in some sense the product of illegal governmental activity.'" Harris, 495 U.S. at 19, 110 S.Ct. 1640 (quoting United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)). The Court went on to determine that the "challenged evidence" in Harris was not the "product of illegal governmental activity" because, unlike the circumstances in Brown, the police in Harris had probable cause and, for that reason, the legal authority to keep the defendant in custody once he was outside the home. Id. Thus, as we have seen, the Court concluded that the suspect's subsequent confession was not the product of unlawful custody.
¶ 16 Nor, in the Court's view, was the confession the "fruit of having been arrested in the home rather than someplace else." Id. The Court analogized the situation in Harris to that in Crews, where the defendant sought the suppression of a witness's in-court identification on the ground that his presence in the courtroom was precipitated by an illegal arrest. His theory was that he was the "fruit" of the illegal arrest, and that he should have been "suppressed," rendering in-court identification impossible. The Court held that the in-court identification was not "`come at by exploitation' of the violation of the defendant's Fourth Amendment rights." Crews, 445 U.S. at 471, 100 S.Ct. 1244 (quoting Wong Sun, 371 U.S. at 488, 83 S.Ct. 407). It explained that the exclusionary rule "delimits *178 what proof the Government may offer against the accused at trial" by "closing the courtroom door to evidence secured by official lawlessness," but the defendant was "not himself a suppressible `fruit,'" since "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." Id. at 474, 100 S.Ct. 1244 (citing Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886)).
¶ 17 The Court in Harris did not elaborate on its analogy to Crews except to say that, because "the police had a justification to question Harris prior to his arrest," his subsequent confession "was not an exploitation of the illegal entry into [his] home." Harris, 495 U.S. at 19, 110 S.Ct. 1640. The Court, it seems, reasoned that, because the police had the legal authority to hold the suspect regardless of his illegal arrest, they were not exploiting the illegality of that arrest (i.e., "the fact that the arrest was made in the house rather than someplace else") any more than the State exploited the illegality of the arrest in Crews, which, under the rule derived from the Ker and Frisbie cases, did not require the suspect's release or "suppression" at trial. Id. at 18-19, 110 S.Ct. 1640. In this way, the Court in Harris divided the arrest from its illegal nature, leaving only the fact of arrest in the chain of causation leading to the challenged confession. See id. at 20, 110 S.Ct. 1640 ("We ... hold that the station house statement in this case was admissible because Harris was in legal custody... and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else."). Hence, according to the Court, the legal issue was the same, for Fourth Amendment purposes, as it would have been had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated him at the police station.
¶ 18 In summary, the reason attenuation analysis was considered appropriate in Brown but not in Harris is that the police officers in Harris had probable cause to believe the suspect was guilty of a felony before their unlawful entry into his house. It was probable cause that furnished the legal authority for the police to keep the suspect in custody once he was outside his house. Because the Payton violation ended at the suspect's door, the United States Supreme Court considered the suspect's confession at the police station properly admissible.
¶ 19 In analyzing article I, section 7 of our state constitution, we do not attach the same significance to the fact that the police officers possess probable cause before their unlawful entry. In our judgment, a rule that makes the admissibility of a confession depend entirely on the legality of custody is incompatible with the purposes of our state's exclusionary rule because it completely ignores the illegality of the preceding arrest. Our state's exclusionary rule, like its federal counterpart, aims to deter unlawful police conduct, but "its paramount concern is protecting an individual's right of privacy." State v. Afana, 169 Wash.2d 169, 180, 233 P.3d 879 (2010). It accomplishes this by closing the courtroom door to evidence gathered through illegal means. By design, then, it is concerned with the way evidence is obtained, with the legality of each link in the causal chain, not merely the last. While the rule authorizing warrantless arrests in a public place may be indifferent to how the suspect came to be outside his home, it does not follow that the exclusionary rule is equally indifferent. The question of the legality of custody following an illegal arrest and the question of the admissibility of the suspect's confession should be kept separate. A rule that treats the answer to the first as dispositive of the second falls short of the protection afforded by our state constitution.
¶ 20 That is not to say that the legality of custody is unimportant, only that it does not necessarily break the causal chain between an illegal arrest and a subsequent confession. Article I, section 7 requires courts to consider the connection between the arrest and the confession. In our view, the proper inquiry is whether the confession is "`sufficiently an act of free will to purge *179 the primary taint.'" Brown, 422 U.S. at 602, 95 S.Ct. 2254 (quoting Wong Sun, 371 U.S. at 486, 83 S.Ct. 407). In Brown, the United States Supreme Court identified three factors, aside from the giving of Miranda warnings, that courts should consider in determining if a confession was sufficiently attenuated from an illegal arrest: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." Id. at 603-04, 95 S.Ct. 2254 (footnote and citation omitted). After applying these factors, the Court concluded that the suspect's confession was inadmissible: "The illegality here ... had a quality of purposefulness. The impropriety of the arrest was obvious.... The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." Id. at 605, 95 S.Ct. 2254.
¶ 21 Although we have not explicitly adopted the attenuation doctrine under article I, section 7, we have employed it time and again in prior decisions to determine whether, in the time-worn metaphor of Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the challenged evidence was "fruit of the poisonous tree" or so "attenuated as to dissipate the taint." See, e.g., State v. Warner, 125 Wash.2d 876, 889 P.2d 479 (1995); State v. Rothenberger, 73 Wash.2d 596, 440 P.2d 184 (1968); State v. Vangen, 72 Wash.2d 548, 433 P.2d 691 (1967). For instance, in State v. Armenta, 134 Wash.2d 1, 17, 948 P.2d 1280 (1997), we applied the Brown factors to determine whether a suspect's confession was tainted by a prior illegal seizure.[9] While we have expressed the exclusionary prohibition in broad terms, our cases do not stand for the proposition that the exclusionary rule under article I, section 7 operates on a "but for" basis.[10] Rather, we have consistently adhered to the "fruit of the poisonous tree" doctrine as articulated in Nardone and Wong Sun. See, e.g., Gaines, 154 Wash.2d at 717, 116 P.3d 993; State v. O'Bremski, 70 Wash.2d 425, 428, 423 P.2d 530 (1967); McNear v. Rhay, 65 Wash.2d 530, 541, 398 P.2d 732 (1965), abrogated on other grounds by State v. Hill, 123 Wash.2d 641, 870 P.2d 313 (1994). In doing so, we have, at least, implicitly adopted the attenuation doctrine, that doctrine being intimately related to the "fruit of the poisonous tree" doctrine.
¶ 22 In fact, the "fruit of the poisonous tree" doctrine and the attenuation doctrine stem from the same source. In the very opinion in which he described evidence derived from the "`Government's own wrong'" as "fruit of the poisonous tree," Justice Felix Frankfurter said, "Sophisticated argument may prove a causal connection," but "[a]s a matter of good sense, ... such connection may have become so attenuated as to dissipate the taint." Nardone, 308 U.S. at 341, 60 S.Ct. 266 (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). The United States Supreme Court then relied on this language in Wong Sun, stating, "[T]his [is not] a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has `become so attenuated as to dissipate the taint.'" Wong Sun, 371 U.S. at 487, 83 S.Ct. 407 (quoting Nardone, 308 U.S. at 341, 60 S.Ct. 266). The Court went on to say,

*180 We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
Id. at 487-88, 83 S.Ct. 407 (quoting John MacArthur Maquire, Evidence of Guilt 221 (1959)). Thus, the attenuation doctrine defines the parameters of the "fruit of the poisonous tree" doctrine. Evidence is not "fruit of the poisonous tree" if the connection between the challenged evidence and the illegal actions of the police is "so attenuated as to dissipate the taint."
¶ 23 This court's decision in Vangen, which the State cited in its brief, illustrates the appropriateness of applying the attenuation doctrine under article I, section 7. There, police officers arrested a person who was suspected of defrauding an innkeeper of $200 through the use of credit cards bearing a false name. The police officers erroneously believed that what was in fact only a misdemeanor constituted a felony. Because they had no warrant for the person's arrest, and the misdemeanor had not been committed in their presence, the arrest was unlawful. "This circumstance," we said, had "`ballooned' into a `false arrest' and a `poisoned tree,'" which the defendant contended rendered his subsequent confession at the police station inadmissible as "fruit of the poisonous tree." Vangen, 72 Wash.2d at 552, 433 P.2d 691. We disagreed, holding that his confession was properly admitted.
[I]t is clear that the confession was not the result of that arrest or of information procured solely therefrom. The appellant arrested late on October 21, and taken to his cell at 12:05 a.m. on October 22at all times stoutly maintained that he was Elmer J. Johnson and that the credit cards in his possession were his. He insisted that he was Elmer J. Johnson through a second interrogation on the morning of October 22. Not until after the police had contacted the real Elmer J. Johnson in Minneapolis by telephone would the appellant admit that he was not Elmer J. Johnson, but Dean Allen Vangen. He then gave an entirely voluntary statement to Detective Homer Hall, after being advised of his constitutional rights, including his right to counsel and to remain silent.
Id. at 553, 433 P.2d 691. We observed that "an illegal detention does not ipso facto make a confession involuntary" and quoted with approval a portion of the opinion of the Supreme Court of Errors of Connecticut in State v. Traub, 151 Conn. 246, 196 A.2d 755 (1963). Vangen, 72 Wash.2d at 555, 433 P.2d 691.
¶ 24 As the Connecticut court said, Even though a detention is illegal, if the confession is truly voluntary and the causation factor of the illegal detention is so weak, or has been so attenuated, as not to have been an operative factor in causing or bringing about the confession, then the connection between any illegality of detention and the confession may be found so lacking in force or intensity that the confession would not be the fruit of the illegal detention. [Traub, 151 Conn. at 250, 196 A.2d 755.]
We think the foregoing quotation fits the present situation with tailor-like exactness....
The appellant persisted in his claim that he was Elmer J. Johnson until contacts with the real Elmer J. Jonson in Minneapolis removed his claim to that name, which makes it clear that it was this informationand not his arrest, legal or illegalthat induced the confession.
Id. We are still convinced that this is the right approach. When a court determines that evidence is not the "fruit of the poisonous tree," a defendant's privacy rights are respected, the deterrent value of suppressing the evidence is minimal, and the dignity of the judiciary is not offended by its admission. An alternative "but for" principle would make it virtually impossible to rehabilitate an investigation once misconduct has occurred, granting suspected criminals a permanent immunity unless, by chance, other law enforcement officers initiate an independent investigation. *181 The factors the United States Supreme Court identified in Brown are designed to aid courts in determining whether an illegal arrest was, as was said in Vangen, the "operative factor in causing or bringing the confession about." Id. For that reason, we again embrace the Brown factors as the proper analytical framework for determining whether a confession is sufficiently an act of free will to purge the taint of an illegal arrest.

B. Is Eserjose's confession admissible under article I, section 7?
¶ 25 Turning to the confession at issue in this case, we note that the circumstances surrounding Eserjose's confession are significantly different from those in Harris. Notably, in Harris, the suspect first confessed in his home, at a time when the Fourth Amendment violation was ongoing. See Harris, 495 U.S. at 16, 110 S.Ct. 1640. Although the confession was determined to be inadmissible, the suspect "had `let the cat out of the bag by confessing' and was not `thereafter free of the psychological and practical disadvantages of having confessed.'" State v. Erho, 77 Wash.2d 553, 561, 463 P.2d 779 (1970) (quoting United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947)). The United States Supreme Court did not consider what effect the suspect's first confession might have had on his willingness to sign a second confession at the police station because, as we have seen, it determined that he was in lawful custody at that point. Eserjose, on the other hand, was not questioned in his home, and so the "voluntariness and admissibility" of his confession at the sheriff's office was not "compromised" by a prior confession. Id. Like the defendant in Vangen, Eserjose maintained his innocence until he was informed that Paragone had confessed, which suggests that it was this information, not the illegal arrest, that induced the confession.
¶ 26 The constitutional violation in this case, moreover, was much less flagrant than the violation in Harris. The record in Harris disclosed that the New York City police routinely violated Payton as a matter of departmental policy in order to circumvent state law, which provided that an arrest warrant could not be issued until an "accusatory instrument" was filed and prohibited police from questioning a suspect without an attorney once such an instrument had been filed. See Harris, 495 U.S. at 25 n. 2, 110 S.Ct. 1640. Here, by contrast, the arresting officers entered Eserjose's home with consent, and only exceeded the scope of consent when they entered the upstairs hallway.
¶ 27 The circumstances of Eserjose's arrest are also noticeably different from those in Mariano, the case from Hawaii, where the court held that the suspect's confession was "`fruit of the poisonous tree'" because the record of his interrogation revealed "an unsophisticated suspect still crying and emotional and still viscerally impressed by the circumstances of his illegal arrest." Mariano, 114 Hawai`i at 282, 160 P.3d 1258 (emphasis added). Unlike the situation in Mariano, here there is no indication that Eserjose was "viscerally impressed by the circumstances of his illegal arrest." Indeed, given that Eserjose's father invited the deputies into the house, the fact that the deputies did not have an arrest warrant might have made no impression at all. Their illegal entry certainly lacked the "quality of purposefulness" and the "obvious" impropriety identified in Brown. Brown, 422 U.S. at 605, 95 S.Ct. 2254. The application of the Brown factors here leads to the conclusion that Eserjose's confession was "`sufficiently an act of free will to purge the primary taint.'" Id. at 602, 95 S.Ct. 2254 (quoting Wong Sun, 371 U.S. at 486, 83 S.Ct. 407).
¶ 28 The dissent asserts, however, that Eserjose's confession must be suppressed in order to remedy the constitutional violation that occurred, i.e., the unlawful arrest. The problem with this argument is that it assumes that the confession is a product of the violation. The dissent takes this for granted with its erroneous view that the "legality of the arrest determines the legality of custody" and says that "a confession obtained during an illegal seizure should be excluded." Dissent at 188 (emphasis added). The flaw in the dissent's position is that Eserjose did not confess during the course of an illegal seizure. Rather, he confessed during the lawful custodial interrogation that occurred after the illegal seizure had ended. As we have *182 observed, the Fourth Amendment allows police to detain a suspect outside his home on the basis of probable cause alone. Watson, 423 U.S. at 424, 96 S.Ct. 820. Thus, while the warrantless arrest was illegal, once Eserjose was outside his home, the ensuing custody was lawful because the arresting officers had probable cause to believe that he had committed a felony. See Harris, 495 U.S. at 17-18, 110 S.Ct. 1640. As the United States Supreme Court said in Harris, there "could be no valid claim here ... that the warrantless arrest required the police to release [the suspect] or that [the suspect] could not be immediately rearrested if momentarily released." Id. at 18, 110 S.Ct. 1640.[11] Since the officers had probable cause before the arrest, that probable cause, not being based on anything they observed during the arrest, was untainted by the warrantless arrest.
¶ 29 The dissent suggests that the "status of custody is ... different" under article I, section 7 because of its "authority of law" requirement. Dissent at 187-88, 187. Like the United States Supreme Court, however, this court has held that police may detain a suspect in a public place on the basis of probable cause alone. State v. Solberg, 122 Wash.2d 688, 696, 861 P.2d 460 (1993) ("An arrest warrant is not required in such circumstances under either the federal or state constitutions."). Thus, if police officers have probable cause to believe that a person has committed a felony, they have the "authority of law" required by article I, section 7 to keep that person in custody.[12]

C. Is the attenuation doctrine compatible with article I, section 7?
¶ 30 The dissent contends that the attenuation doctrine is incompatible with article I, section 7 for a number of reasons. It says that the attenuation doctrine fails to "infuse the fruits of an illegal seizure with the authority of law." Dissent at 189. This argument overlooks the fact that, as we have just noted, Eserjose's confession was obtained with the requisite "authority of law," the deputies having the legal authority based on probable cause developed independently of the illegal arrest to keep Eserjose in custody and to question him about the burglary. Under Harris, our analysis would end there; but to satisfy article I, section 7, it is necessary to determine whether the confession, though the direct product of lawful custodial interrogation, was the indirect product of the prior arrest, which lacked the "authority of law." As we said in Gaines, the exclusionary rule applies equally to "evidence seized during an illegal search [or seizure]," and "evidence derived from an illegal search [or seizure] under the fruit of the poisonous tree doctrine." Gaines, 154 Wash.2d at 716, 717, 116 P.3d 993 (emphasis added). The dissent maintains that Eserjose's confession was the "fruit[ ] of an illegal seizure," dissent at 189; but a suspect's confession is not the "fruit" of an illegal arrest simply because the suspect would not have been in custody "but for" that arrest. The "fruit of the poisonous tree" doctrine does not operate on a "but for" basis. Wong Sun, 371 U.S. at 488, 83 S.Ct. 407. As we explained in Vangen, the illegal seizure must "`have been an operative factor in causing or bringing about the confession.'" Vangen, 72 Wash.2d at 555, 433 P.2d 691 (quoting Traub, 151 Conn. at 250, 196 A.2d 755).[13] The record shows that it was not in this case.
*183 ¶ 31 The dissent also says that we are duty bound to reject the attenuation doctrine in order to preserve the "heightened protections of article I, section 7." Dissent at 188.[14] It compares the attenuation doctrine to the inevitable discovery doctrine and the "good faith" exception to the exclusionary rule, which we have rejected under article I, section 7. See Winterstein, 167 Wash.2d at 631, 220 P.3d 1226; Afana, 169 Wash.2d at 184, 233 P.3d 879. Those doctrines, however, are fundamentally different from the attenuation doctrine. The inevitable discovery doctrine allows the admission of evidence that was seized illegally if it would have been seized legally eventually. See Nix v. Williams, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The "good faith" exception to the exclusionary rule permits evidence that was seized illegally to be admitted if the seizure was objectively reasonable at the time. See United States v. Leon, 468 U.S. 897, 926, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In both contexts, the evidence is obtained "without authority of law," in violation of article I, section 7 and, consequently, we have not approved of the doctrines under our state constitution. In contrast, the attenuation doctrine admits evidence that is obtained with the "authority of law," provided that the evidence was not "`come at by the exploitation'" of a prior illegal act. Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (quoting Maquire, supra, at 221). Two of the attenuation factors are the passage of time and the presence of intervening circumstances. If evidence is obtained "without authority of law," i.e., while the violation is ongoing, no time will have passed and no circumstances will have intervened, in which case the evidence will not be attenuated. Thus, the attenuation doctrine applies only to evidence obtained legally. Unlike the inevitable discovery doctrine and "good faith" exception, the attenuation doctrine complies with article I, section 7's "authority of law" requirement.
¶ 32 The dissent claims, finally, that the attenuation doctrine, like the "inevitable discovery" exception, is too "speculative" to pass constitutional muster. Dissent at 189. But unlike "inevitable discovery," the attenuation doctrine focuses on events as they actually happened in order to determine whether police misconduct produced the evidence in question. There is nothing troublesome about this sort of causal analysis. The "independent source" exception, which this court has repeatedly upheld under article I, section 7, is, if anything, more speculative. Under that exception, evidence obtained pursuant to a warrant is admissible, even though the warrant recites information tainted by an unconstitutional search, provided the warrant contains enough untainted information to establish probable cause. See Gaines, 154 Wash.2d at 719, 116 P.3d 993. Before a court can pronounce the warrant lawful, however, it must find that police would have sought the warrant anyway, even without knowing the information revealed by the unconstitutional search. Id. at 721, 116 P.3d 993 (citing Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)).
¶ 33 The dissent accuses us of abandoning the rule that "`whenever the right of privacy is violated, the remedy [of exclusion] follows automatically.'" Dissent at 187 (quoting Afana, 169 Wash.2d at 180, 233 P.3d 879). The rule assumes, however, that the violation produced the evidence the defendant seeks to exclude. If, after applying the attenuation factors, it appears that the evidence is not the product of the violation, it should not be *184 suppressed. Properly understood, the attenuation doctrine is perfectly consistent with our rule.[15] While we share the dissent's concern for the warrant requirement, our decision in no way "removes the incentive for police officers to secure a warrant before invading a citizen's home." Dissent at 186. The attenuation doctrine considers the "purpose and flagrancy of the official misconduct." Brown, 422 U.S. at 604, 95 S.Ct. 2254. If the record shows that police disregarded the warrant requirement for the purpose of securing a confession, the confession will be suppressed. Similarly, if the record shows that an illegal arrest induced the confession, the confession will be excluded. The dissent would replace the categorical rule adopted in Harris with an equally categorical rule and exclude a suspect's confession solely on the basis that the suspect would not have been in custody but for an illegal arrest. Such a rule would be unprecedented. Even the states that have rejected Harris have done so in favor of attenuation. See, e.g., Mariano, 114 Hawai`i at 281-82, 160 P.3d 1258. No jurisdiction has applied the exclusionary rule on a "but for" basis. Such an approach is not only inappropriate; it far exceeds anything article I, section 7 requires.

Conclusion
¶ 34 In sum, we hold that the Harris exception is incompatible with the exclusionary rule under article I, section 7 of the Washington Constitution but that Eserjose's confession was not attributable to the illegal arrest. Thus, the trial court did not err in determining that Eserjose's confession was admissible under article I, section 7 of our state constitution as well as the Fourth Amendment to the United States Constitution. Eserjose's conviction is accordingly affirmed.
WE CONCUR: MARY E. FAIRHURST, result only, JAMES M. JOHNSON and DEBRA L. STEPHENS, Justices.
MADSEN, C.J. (concurring).
¶ 35 I concur in the result reached by the lead opinion. Because the deputies did not obtain James Eserjose's confession by exploiting any unlawful act, his confession is admissible. I write separately because the lead opinion applies an attenuation analysis where none is required.

ANALYSIS
¶ 36 Article I, section 7 of the Washington State Constitution requires exclusion of evidence seized during an illegal search or seizure. State v. Gaines, 154 Wash.2d 711, 716-17, 116 P.3d 993 (2005). To prevent the government from benefiting from such unlawful activity, article I, section 7 also requires suppression of evidence derived from an illegal search or seizure under the "fruit of the poisonous tree doctrine." Id. at 717, 116 P.3d 993 (citing State v. O'Bremski, 70 Wash.2d 425, 428, 423 P.2d 530 (1967)).
¶ 37 However, we have recognized that under article I, section 7, only evidence obtained as a result of unlawful government activity must be excluded in order to respect both the privacy interests of the individual and the State's interest in prosecuting criminal activity. State v. Winterstein, 167 Wash.2d 620, 634, 220 P.3d 1226 (2009) (citing Gaines, 154 Wash.2d at 720, 116 P.3d 993). Thus, although article I, section 7's greater solicitude for personal privacy often requires broader application of the exclusionary rule, evidence not obtained by unlawful government conduct need not be suppressed. See State v. Maxwell, 114 Wash.2d 761, 769, 791 P.2d 223 (1990). In this case, exclusion of Eserjose's confession is not required because, as the lead opinion notes, Eserjose did not confess during the course of an illegal seizure. Lead opinion at 181.
¶ 38 No one disputes that the deputies had probable cause to arrest Eserjose or that the deputies entered Eserjose's home with his father's consent. Thus, any illegality occurred when the deputies exceeded the scope *185 of Eserjose's father's consent and went upstairs to arrest Eserjose. But Eserjose did not confess upon his arrest in the hallway, and the deputies did not seize evidence from Eserjose or the house. And, although Eserjose himself was seized, his seizure was not unlawful as it was based on probable cause.
¶ 39 The "evidence" that Eserjose says must be suppressed is the confession he gave at the sheriff's office following Miranda[1] warnings. But as the lead opinion correctly notes, Eserjose confessed when confronted with his accomplice's confession at the sheriff's office. Lead opinion at 180-81. There is nothing indicating that the decision to confess was in any way related to the fact that he was arrested in his upstairs hallway; there is no connection between the illegality and the confession. Accordingly, Eserjose's confession is connected to his learning of his accomplice's confession, and not to any illegality associated with the deputies' exceeding the scope of consent to enter the home. This should end the analysis.
¶ 40 Unfortunately, the lead opinion reads article I, section 7 as requiring us to conflate the separate inquiries of causation and attenuation. Lead opinion at 182 ("[u]nder [New York v.] Harris, our analysis would end there; but to satisfy article I, section 7, it is necessary to determine whether the confession, though the direct product of lawful custodial interrogation, was the indirect product of the prior arrest"). Adopting the rule proposed by the dissenting opinion in New York v. Harris, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the lead opinion proceeds to apply the three-factor test of Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine "whether the confession is `sufficiently an act of free will to purge the primary taint.'" Lead opinion at 178-79 (internal quotation marks omitted) (quoting Brown, 422 U.S. at 602, 95 S.Ct. 2254).[2]
¶ 41 However, as the majority in Harris noted, causation and attenuation are separate and distinct inquiries. Harris, 495 U.S. at 19, 110 S.Ct. 1640 ("attenuation analysis is only appropriate where, as a threshold matter, courts determine that `the challenged evidence is in some sense the product of illegal governmental activity'" (quoting United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980))). Attenuation asks how far existing causation may be stretched as a matter of "good sense." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). By contrast, causation itself turns on the logical link between the illegal governmental conduct and the acquisition of the challenged evidence. Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (distinguishing evidence "`attenuated'" from the government's lawless conduct from evidence that has not "`been come at by exploitation of that illegality'" in the first place (quoting Nardone, 308 U.S. at 341, 60 S.Ct. 266 and John MacArthur Maquire, Evidence of Guilt 221 (1959))). The lead opinion erroneously confuses these distinct inquiries.
¶ 42 In addition, the lead opinion concludes that our state's exclusionary rule requires it to consider "the legality of each link in the causal chain, not merely the last." Lead opinion at 178. This is also erroneous because *186 under article I, section 7, the requisite correlation between the illegality and the evidence obtained may be severed by any "link in the chain." Indeed, we have repeatedly held that even where a constitutional violation occurs at some point in a search, article I, section 7 does not require exclusion of evidence if information independent of the illegality supports a later valid search or if illegally obtained information in a search warrant can be redacted. See, e.g., Gaines, 154 Wash.2d at 720, 116 P.3d 993; Maxwell, 114 Wash.2d at 769, 791 P.2d 223; State v. Coates, 107 Wash.2d 882, 887, 735 P.2d 64 (1987); State v. Casal, 103 Wash.2d 812, 820-21, 699 P.2d 1234 (1985); State v. Cockrell, 102 Wash.2d 561, 571, 689 P.2d 32 (1984); O'Bremski, 70 Wash.2d at 428, 423 P.2d 530. Any connection here was severed when Eserjose's confession occurred in response to learning that his accomplice had confessed.[3]
¶ 43 The scope of my disagreement with the lead opinion is limited. Had the deputies seized physical evidence from the upstairs of the home during the arrest, the evidence would unquestionably have been the proper subject of suppression. See State v. Garvin, 166 Wash.2d 242, 254, 207 P.3d 1266 (2009) ("`[t]he exclusionary rule mandates the suppression of evidence gathered through unconstitutional means'" (quoting State v. Duncan, 146 Wash.2d 166, 176, 43 P.3d 513 (2002))). Likewise, my resolution of this case would be different had Eserjose made an inculpatory statement in the house if that statement was obtained by exploiting the illegal entry into the upstairs hallway. Lead opinion at 180-81. Here, however, the only thing seized from the home was Eserjose himself, who is not the "fruit" of his own arrest. See Crews, 445 U.S. at 474, 100 S.Ct. 1244 ("[r]espondent is not himself a suppressible `fruit'").
¶ 44 Lastly, the lead opinion describes the results other states have reached on this issue as "mixed." Lead opinion at 176. However, it is telling that Arizonathe only one of these states with constitutional language identical to article I, section 7has found the Harris majority's rule fully consistent with the protections of its constitution. See State v. Cañez, 202 Ariz. 133, 152, 42 P.3d 564 (2002). While the lead opinion acknowledges this as "notable," it makes no effort to explain why the same language in our constitution should be interpreted differently.

CONCLUSION
¶ 45 Although Eserjose confessed after the deputies exceeded the scope of the consent they were given, the deputies did not exploit the illegal entry into Eserjose's upstairs hallway to obtain the confession. There is therefore no connection between the government's unlawful act and Eserjose's confession. Because the lead opinion erroneously applies an attenuation inquiry, I concur in the result only.
C. JOHNSON, J. (dissenting).
¶ 46 The lead opinion vitiates the warrant requirement for arrests that occur within a suspect's home. By allowing an attenuation exception to the exclusionary rule under the facts of this case, the lead opinion effectively removes the incentive for police officers to secure a warrant before invading a citizen's home and offers no remedy for the constitutional violation. The lead opinion concludes, based on its characterization of the events here, that the constitutional violation is not so awful as to require a remedy. But this infers that worse conduct would be remedied. This result does not make sense per article I, section 7 of our state constitution. Such a broad exception is at odds with the nearly *187 categorical protections found in article I, section 7. I dissent.
¶ 47 It is well established that article I, section 7 provides greater protection than its federal counterpart and "`clearly recognizes an individual's right to privacy with no express limitations.'" State v. Winterstein, 167 Wash.2d 620, 631, 220 P.3d 1226 (2009) (quoting State v. White, 97 Wash.2d 92, 110, 640 P.2d 1061 (1982)). Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The requisite "authority of law" is generally a warrant. Winterstein, 167 Wash.2d at 628, 220 P.3d 1226. Any exceptions to the warrant requirement, therefore, are "`jealously and carefully drawn.'" State v. Morse, 156 Wash.2d 1, 7, 123 P.3d 832 (2005) (internal quotation marks omitted) (quoting State v. Reichenbach, 153 Wash.2d 126, 131, 101 P.3d 80 (2004)). When evidence is obtained without a warrant, our exclusionary rule requires suppression unless the State can show the warrantless search or seizure falls within one of the well-established exceptions.
¶ 48 Because the constitutional violation here is not at issue, we need only focus on what remedy is permitted. The lead opinion concludes that no remedy is required. Disturbingly, the lead opinion does not tell us why the rule requiring some remedy is being abandoned. Suppression of unlawfully and unconstitutionally obtained evidence is nearly always compelled by our exclusionary rule. Our exclusionary rule is constitutionally mandated, and we have often said that "the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy." White, 97 Wash.2d at 110, 640 P.2d 1061. We have long thought that where there is a right, there must be a remedy, State v. Dersiy, 121 Wash. 455, 458, 209 P. 837 (1922), adhered to on reh'g, 121 Wash. 455, 215 P. 34 (1923),[1] and therefore our exclusionary rule is nearly categorical. As we recently stated,
[I]f a police officer has disturbed a person's "private affairs," we do not ask whether the officer's belief that this disturbance was justified was objectively reasonable, but simply whether the officer had the requisite "authority of law." If not, any evidence seized unlawfully will be suppressed. With very few exceptions, whenever the right of privacy is violated, the remedy follows automatically.
State v. Afana, 169 Wash.2d 169, 180, 233 P.3d 879 (2010). This constitutional principle applies most strongly where the violation is of a home, which is expressly protected by article I, section 7. Yet the lead opinion invites us to consider the character and quality of the violation and, evidently, concludes that only if egregious enough will the violation be remedied. This ignores our constitutional requirements. The language of our constitution is not so equivocal.
¶ 49 Article I, section 7 of our constitution requires that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." And such authority is granted by a warrant. Morse, 156 Wash.2d at 7, 123 P.3d 832. A warrantless arrest within a person's home is therefore without authority of law, the ensuing custody of the suspect is illegal, and any evidence derived from this custody should be suppressed, unless the State can show application of a recognized exception to the warrant requirement. See Afana, 169 Wash.2d at 180, 233 P.3d 879. The resulting status of custody is therefore different under our approach than under the Fourth Amendment.[2]
¶ 50 The lead opinion would keep separate "[t]he question of the legality of custody following an illegal arrest and the question of *188 the admissibility of the suspect's confession" because "[a] rule that treats the answer to the first as dispositive of the second falls short of the protection afforded by our state constitution." Lead opinion at 178. This cannot be so. Because a warrantless arrest within a suspect's home almost necessarily results in illegal custody, the rule should be that the legality of the arrest determines the legality of custody and a confession obtained during an illegal seizure should be excluded. This is the remedy required by our constitution. It is not to say that officers must release a suspect whom they otherwise may keep in custody pursuant to probable cause, it merely means that any evidence derived from the illegality is inadmissible against the suspect. This result is required by our long-standing protection of individual privacy and the integrity of the judicial system, which we do not taint with illegally obtained evidence. See Winterstein, 167 Wash.2d at 632, 220 P.3d 1226. Moreover, this is the result compelled by an exclusionary rule that seeks to deter unlawful police behavior. Under the lead opinion's analysis, police have less incentive to obtain an arrest warrant if a station house confession is admissible despite an illegal arrest. See State v. Rife, 133 Wash.2d 140, 148, 943 P.2d 266 (1997). Without remedying the constitutional violation, constitutional protections are inevitably diminished. See State v. Ladson, 138 Wash.2d 343, 359, 979 P.2d 833 (1999) (citing Sanford E. Pitler, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy, 61 Wash. L.Rev. 459, 508 (1986)).
¶ 51 We should therefore reject the attenuation exception (as the lead opinion seems to embrace) to our exclusionary rule as fundamentally at odds with our jurisprudence. With every encroachment on Fourth Amendment protections by the United States Supreme Court, this court has reacted by rejecting such changes and preserving the heightened protections of article I, section 7. See State v. Hehman, 90 Wash.2d 45, 47, 49, 578 P.2d 527 (1978) (rejecting United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973) and disallowing custodial arrests for minor traffic infractions); State v. Simpson, 95 Wash.2d 170, 180, 622 P.2d 1199 (1980) (rejecting United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) and preserving automatic standing in possession cases); White, 97 Wash.2d at 107 & n. 6, 640 P.2d 1061 (rejecting Michigan v. DeFillippo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) and disallowing a good faith arrest exception under a flagrantly unconstitutional law); State v. Ringer, 100 Wash.2d 686, 689-90, 674 P.2d 1240 (1983) (rejecting United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) and New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) and limiting a search incident to arrest to area of immediate control), overruled on other grounds by State v. Stroud, 106 Wash.2d 144, 720 P.2d 436 (1986); State v. Chrisman, 100 Wash.2d 814, 819-20, 676 P.2d 419 (1984) (rejecting Washington v. Chrisman, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) and requiring specific articulable facts for warrantless entry of dwelling following arrest); State v. Jackson, 102 Wash.2d 432, 435, 688 P.2d 136 (1984) (rejecting Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and maintaining two-pronged Aguilar Spinelli[3] test for informant tips); State v. Myrick, 102 Wash.2d 506, 513, 688 P.2d 151 (1984) (rejecting Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) and Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) and changing inquiry from defendant's expectation of privacy to protection of private affairs). We should similarly reject attenuation, under the circumstances of this case, as framed by the United States Supreme Court and embraced by the lead opinion as inconsistent with article I, section 7. Our recent decisions, which reject the federal "inevitable discovery" and "good faith" exceptions to the exclusionary rule, illustrate why this is required.
*189 ¶ 52 In Winterstein, 167 Wash.2d at 631, 220 P.3d 1226, we held that the "inevitable discovery" exception is incompatible with article I, section 7 of our constitution. That necessarily speculative federal doctrine would allow admission of illegally obtained evidence if the State can establish that the evidence would ultimately have been discovered by lawful means. We rejected its application in Washington because it is justified only by reliance on the Fourth Amendment purpose of deterrence, which conflicts with our guarantees of individual privacy with no express limitations. Winterstein, 167 Wash.2d at 634-35, 220 P.3d 1226. Relying on our reasoning in State v. O'Neill, 148 Wash.2d 564, 591-92, 62 P.3d 489 (2003), we concluded the inevitable discovery doctrine would leave no incentive for compliance with the article I, section 7 requirement that an arrest precede a search, and rejected its application.
¶ 53 The year following Winterstein, we again rejected the federal "good faith" exception to exclusion in Afana, 169 Wash.2d at 184, 233 P.3d 879. Under the good faith exception, exclusion is not necessary when officers are acting with an "objectively reasonable reliance" on something that appeared to justify the search or seizure because the exclusionary rule should not deter reasonable law enforcement activity. Afana, 169 Wash.2d at 180, 233 P.3d 879. We again distinguished between the federal emphasis on deterrence as opposed to our "paramount concern [of] protecting an individual's right of privacy." Afana, 169 Wash.2d at 180, 233 P.3d 879. Rather than asking if an officer's belief that an invasion of privacy is justified or objectively reasonable, we inquire into whether the officer had the requisite authority of law as required by article I, section 7 of our constitution. If not, then subject to few exceptions, the remedy of suppression follows the violation automatically. In reaching that conclusion, we revisited our reasoning in Winterstein and discussed that neither the inevitable discovery nor the good faith exception disregards illegally obtained evidence. Finding the "good faith" exception inconsistent with our nearly categorical exclusionary rule, we rejected it.
¶ 54 An attenuation exception, as articulated by the lead opinion, is fundamentally at odds with our article I, section 7 protection. Just like the inevitable discovery exception rejected in Winterstein and the good faith exception rejected in Afana, this attenuation exception allows illegally obtained evidence to be admitted. Nor does such a doctrine respect our paramount concern of protecting individual privacy, as it would deny a remedy to those whose privacy has been unconstitutionally invaded.[4] Additionally, application of the exception would necessarily be speculative, a departure from our otherwise nearly categorical exclusionary rule.
¶ 55 More importantly, nothing in the attenuation doctrine apparently embraced by the lead opinion suggests how time, intervening circumstances, or less egregious misconduct can infuse the fruits of an illegal seizure with the authority of law required by article I, section 7. "When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed." Ladson, 138 Wash.2d at 359, 979 P.2d 833. The only exception to this rule we have explicitly recognized is when evidence is acquired from an independent source with the requisite authority of law. See State v. Gaines, 154 Wash.2d 711, 718, 116 P.3d 993 (2005). Evidence obtained in violation of a person's constitutional rights, even if attenuated, still lacks the authority of law and should be suppressed. We should reverse and remand for a new trial with directions to exclude the confession.
WE CONCUR: TOM CHAMBERS and SUSAN OWENS, Justices, and RICHARD B. SANDERS, Justice Pro Tem.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Although the record before us does not disclose what happened to Paragone, it appears that he pleaded guilty to a charge of second degree burglary and was sentenced in 2008. See State v. Paragone, No. 08-1-00971-6 (Kitsap County Super. Ct., Wash. Sept. 25, 2008).
[3] The court considered the upstairs hallway a "private area, not normally open to guests" and, therefore, "not an area an occupant would assume a risk that a co-occupant would give consent to another to enter." Clerk's Papers at 90.
[4] The trial court's findings of fact are based entirely on the stipulations of the parties and are unchallenged.
[5] The exclusionary rule requires the suppression of evidence obtained in violation of a defendant's constitutional rights. The exclusionary rule originated in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), in which the United States Supreme Court held that the admission of private papers seized in violation of the Fourth Amendment, in effect, compelled a person to be a witness against himself in violation of the Fifth Amendment. After reverting to the common law rule of nonexclusion in Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904), the United States Supreme Court revived the exclusionary rule in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Boyd, Weeks, and Silverthorne Lumber Co. inspired this court to adopt the exclusionary rule in State v. Gibbons, 118 Wash. 171, 203 P. 390 (1922). See generally Sanford E. Pitler, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy, 61 Wash. L.Rev. 459 (1986).
[6] Article I, section 7 states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."
[7] In State v. Riley, 121 Wash.2d 22, 31-32, 846 P.2d 1365 (1993), we declined to address that question because it was raised for the first time on appeal and the record was inadequate.
[8] Hawaii's article I, section 7 provides as follows: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted."
[9] We noted that, while the defendants cited the state constitution in their briefs, they did not allege pursuant to State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986), that we should interpret article I, section 7 independently of the Fourth Amendment. Accordingly, we confined our analysis to the Fourth Amendment. See Armenta, 134 Wash.2d at 10 n. 7, 948 P.2d 1280.
[10] In State v. Ladson, 138 Wash.2d 343, 359, 979 P.2d 833 (1999), we said, "When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed." Ladson relied on State v. Kennedy, 107 Wash.2d 1, 4, 726 P.2d 445 (1986), but in that case, we expressed the "fruit of the poisonous tree" doctrine differently. We said, "If the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree." Id. Kennedy, in turn, relied on the authority of Wong Sun, in which the United States Supreme Court said, "We need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun, 371 U.S. at 487-88, 83 S.Ct. 407.
[11] Notably, even the dissenting opinion in Harris acknowledges that the "violation ends" once the suspect is outside his house, at which point the suspect is "lawfully detained." Harris, 495 U.S. at 28, 27, 110 S.Ct. 1640 (Marshall, J., dissenting). This "proposition," said Justice Marshall, is "self-evident" and "unexceptionable." Id. at 27, 110 S.Ct. 1640.
[12] The dissent assures us that it is not saying "that officers must release a suspect whom they otherwise may keep in custody pursuant to probable cause." Dissent at 188 (emphasis added). But if, as the dissent admits, probable cause gives officers the authority to keep the suspect in custody, the custody must be legal. If the custody was illegal, the suspect would have the right to be released. See, e.g., Brown, 422 U.S. at 601 n. 6, 95 S.Ct. 2254 (a person has a Fourth Amendment right "to be released from unlawful custody" following an arrest without a warrant or probable cause).
[13] The dissent supposes, relying on Ladson, that "`[w]hen an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree.'" Dissent at 189 (quoting Ladson, 138 Wash.2d at 359, 979 P.2d 833). As we noted earlier, Ladson misstated the "fruit of the poisonous tree" doctrine. In Kennedy, which Ladson cited, we said, "If the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree." Kennedy, 107 Wash.2d at 4, 726 P.2d 445 (emphasis added). Kennedy is perfectly consistent with the conventional view that, "[a]s a matter of good sense," the connection between police misconduct and the discovery of the challenged evidence "may have become so attenuated as to dissipate the taint." Nardone, 308 U.S. at 341, 60 S.Ct. 266. There is no justification for applying the "fruit of the poisonous tree" doctrine differently under article I, section 7 than under the Fourth Amendment.
[14] The dissent declares, "With every encroachment upon Fourth Amendment protections by the United States Supreme Court, this court has reacted by rejecting such changes." Dissent at 188. The United States Supreme Court decided Wong Sun during the high water mark of Fourth Amendment protections under the Warren Court. The attenuation doctrine is certainly not a fresh assault on the Fourth Amendment.
[15] Rather than applying the attenuation factors in order to determine whether Eserjose's confession was the "fruit" of the unlawful arrest, the dissent begins with the premise that the confession is the "fruit[] of an illegal seizure" and then applies the attenuation factors, asking how they can "infuse" such "fruit" with the authority of law. Dissent at 189. The dissent's approach begs the question the attenuation doctrine is intended to answer.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The lead opinion cites State v. Armenta, 134 Wash.2d 1, 948 P.2d 1280 (1997), and State v. Rothenberger, 73 Wash.2d 596, 440 P.2d 184 (1968), as examples of cases where we have applied the factors of Brown to ensure sufficient attenuation under article I, section 7. Lead opinion at 179-80. These cases are unhelpful. In Armenta, as in Brown, the alleged illegality was the lack of probable cause prior to the seizure. Brown and its progeny are distinguishable from this case since the violation is qualitatively different: here the deputies had probable cause to arrest. Rothenberger is also distinguishable because the court there assumed without deciding that a seizure had occurred and that it was unlawful. Rothenberger, 73 Wash.2d at 599-600, 440 P.2d 184. Finally, the lead opinion's citations to State v. Warner, 125 Wash.2d 876, 889 P.2d 479 (1995), and State v. Vangen, 72 Wash.2d 548, 433 P.2d 691 (1967), are likewise unhelpful because neither case applied article I, section 7. Lead opinion at 178-79. I note, however, that even in Warner, decided in the context of the Fifth Amendment, we recognized that inquiry into attenuation was appropriate only where it first could be determined that the challenged evidence was "discovered as a direct result of a compelled incriminating statement." Warner, 125 Wash.2d at 888, 889 P.2d 479.
[3] Although the article I, section 7 violation ended once the deputies removed Eserjose from his house, his confession would still be inadmissible if obtained in violation of the Fifth Amendment. See Harris, 495 U.S. at 20, 110 S.Ct. 1640. Had Eserjose raised a Fifth Amendment challenge, the court would have started its analysis there, since the voluntariness of the statement at issue is a "threshold requirement." Brown, 422 U.S. at 604, 95 S.Ct. 2254. However, because Eserjose does not claim that his confession was coerced, this court need not consider this a basis for exclusion. I do so only to point out that Eserjose can raise a Fifth Amendment challenge. Thus, contrary to the lead opinion's suggestion, we are not left with "a rule that makes the admissibility of a confession depend entirely on the legality of custody." Lead opinion at 178.
[1] In fact, this state was an early adopter of the exclusionary rule. See State v. Gibbons, 118 Wash. 171, 203 P. 390 (1922). We continued to independently develop the rule until the federal supreme court required states to apply the federal exclusionary rule in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Sanford E. Pitler, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy, 61 Wash. L.Rev. 459, 465 (1986).
[2] Under the Fourth Amendment, if the police have probable cause to arrest a suspect, even if they do so without a warrant and within the suspect's home, the resulting custody is lawful. New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).
[3] See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), abrogated by Gates, 462 U.S. 213, 103 S.Ct. 2317; Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), abrogated by Gates, 462 U.S. 213, 103 S.Ct. 2317.
[4] The lead opinion states, without explaining, that "[w]hen a court determines that evidence is not the `fruit of the poisonous tree,' a defendant's privacy rights are respected." Lead opinion at 180. This judicial determination will likely provide little comfort to persons who have been illegally arrested within their most sacred space, their home.